The CRUDE COMPANY, Plaintiff,

v.

The FEDERAL ENERGY REGULATORY COMMISSION and Department of Energy, Defendants.

Civil Action No. 94–00035.

United States District Court, District of Columbia.

April 10, 1996.

---

Robert Lester Weinberg, William Morton Wiltshire, Michael Richard Pompeo, Williams & Connolly, Washington, DC, for The Crude Company.

Thomas William Millet, IV, Marsha Stelson Edney, Lawrence D. Rosenberg, U.S. Department of Justice, Civil Division, Washington, DC, for F.E.R.C., Department of Energy and U.S.

## MEMORANDUM OPINION

SPORKIN, District Judge.

At issue in this case is the validity of the defendants' decision that plaintiff must repay $1.2 million in small refiner bias entitlements obtained pursuant to a tripartite crude oil processing arrangement in effect from January through May of 1977. Plaintiff, The Crude Company ("TCC"), challenges the validity of the administrative proceedings held on the issue and of defendants' decision to assess $1.2 million in restitution plus interest, including prejudgment interest. Plaintiff has moved for summary judgment on Counts 2–18 of the complaint, and defendants have cross-moved for summary judgment on all Counts. The parties have briefed the issues, and oral argument has been heard. A trial was held on Count 1—in which plaintiff claims that it is entitled to benefit from an offset against a $14.1 million settlement that DOE received from one of the parties involved in the tripartite processing arrangement. The parties have briefed and orally argued their motions.

## I. BACKGROUND

This case has its genesis in the oil crisis of the 1970s. Concerned about the shortages of crude oil and refined petroleum products, Congress passed the Emergency Petroleum Allocation Act of 1973 ("EPAA"), 15 U.S.C. §§ 751–760h. One of the purposes of the EPAA was to preserve and foster competition in the domestic petroleum industry, including preservation of the competitive viability of small crude oil refiners. 15 U.S.C. § 753(b)(1)(D). The regulations authorized the allocation of small refiner bias ("SRB") entitlements to small refiners of crude oil as a means of neutralizing certain advantages of large refiners and preserving the small refiners' competitive position in the market. 10 C.F.R. § 211.67(e). The amount of entitlements a small refiner received correlated directly to the amount of crude oil processed by or for the account of the small refiner. Refiners participating in the entitlements program were required to file Refiners Monthly Reports, reporting the volume and tier [1] of all crude oil refined at their refinery or at some other refinery pursuant to a processing agreement. 10 C.F.R. § 211.66(b).

### A. *The Tripartite Processing Arrangement*

The processing agreement at issue in this case was a tripartite arrangement involving: (1) TCC, a crude oil reseller; (2) Southwestern Refining Company, Inc. ("SRCI"), a small refiner; and (3) Champlin Petroleum Company ("Champlin"), a larger refiner. On its face the processing agreement entered into by TCC and SRCI called for TCC to sell barrels of crude oil to SRCI. Champlin was to process the barrels of crude oil, ostensibly for SRCI's account. Champlin was to sell the refined product back to TCC for resale on the open market.

The arrangement, in practice, was somewhat different. Crude oil was not physically shipped from TCC's storage tanks, to SRCI and ultimately to Champlin. TCC would acquire title to oil located close to Champlin's refinery at Corpus Christi. The crude would be delivered from the tankers or barges directly into Champlin's crude oil storage tanks. After Champlin processed the oil, it

---

1. Entitlements also varied depending on the tier of the crude oil processed, e.g. foreign oil, stripper well oil, new domestic oil and old domestic oil. Refiners with reserves of old oil could acquire the crude at a much lower price than those with access to only the other types of oil. The entitlements program, in part, served to equalize the cost of crude oil to all refiners.

would sell the refined product to back to TCC, which in turn would resell the oil to wholesalers.

At no point did SRCI physically receive the crude oil, either from TCC or Champlin. SRCI's only involvement in the transaction was on paper. As put by DOE's adjudicative authority, TCC, not SRCI, had the "sole authority to procure the crude oil, to administer the processing agreement with Champlin, to pay the processing fees, ... to dispose of the refined products ...[,] and to set prices for the purchase of the crude oil and the sale of the refined products." *Southwestern Refining Co., Inc. and The Crude Co.*, 21 DOE (CCH) ¶ 83,011 (1991). DOE also found that "SRCI at no time handled or directed or had an opportunity to assume possession or control of the crude oil or refined products, and the refined products at no time entered SRCI's existing distribution and marketing system." *Id.*

What SRCI did was to file reports necessary to "qualify for, obtain, sell and collect for all 'entitlements' that will inure to it ... as a result of ... causing crude oil to be so processed for the account of SRCI by [Champlin]." TCC was appointed the exclusive sales representative in the sale of entitlements received by SRCI, which assigned all of the proceeds from the sale of the entitlements to TCC. In return, TCC agreed to pay SRCI 25 cents per barrel of crude oil processed under the tripartite arrangement. A total of 613,270 barrels were processed under the tripartite arrangement, which was in effect from January through May of 1977. In return for processing the crude oil, Champlin received $1.82 per barrel of crude refined and was allowed to retain 10 percent of the refined product.

While there is little dispute among the parties about how the arrangement was structured, there is a difference of opinion regarding how the transaction originated. TCC claims that SRCI instigated and orchestrated the tripartite arrangement as a way to greatly increase its economic activity by having additional barrels refined for its account. According to TCC, SRCI lacked the capital needed to purchase the crude oil directly and so sought credit from TCC, offering to sell the refined product back to TCC as security for the credit it received. The government contends that the tripartite arrangement was merely a series of sham paper transactions designed solely to obtain SRB benefits, and that TCC was the "animating force" behind the transactions.

### B. *The Regulatory Framework*

At the time of the transactions at issue, DOE regulations granting SRB entitlements generally included crude oil processed pursuant to a processing agreement at another refinery for the account of a small refiner. *See* 10 C.F.R. § 211.62 and § 211.67(d)(1). Where a non-refiner owned the processed crude oil, that oil was to be included in the entitlements obligations of the processing refiner. 10 C.F.R. §§ 211.62 and 211.67(d)(1).

In May 1976, in response to pervasive abuse of the entitlements program through paper transactions designed solely to obtain SRB entitlements, the DOE revised its regulations. Under the revision, no entitlements would be allowed for oil processed for the account of a small refiner by another refiner under a processing agreement where the small refiner purchased the crude oil from and sold, either directly or indirectly, the refined products produced under the processing agreement to the other refiner. 10 C.F.R. § 211.67(e)(2) (1976) (codifying 41 Fed.Reg. 20,392 (1976)). The rule was "[i]ntended to prevent refiners from entering into processing agreements to process crude oil for a small refiner for no valid business purpose other than obtaining a portion of the benefits of the small refiner bias." 41 Fed. Reg. 9391, 9393 (1976). It was this 1976 regulation that was in effect at the time of the processing transactions at issue here.

Continued abuses of the entitlements program eventually prompted adoption of a blanket prohibition on receipt of entitlements pursuant to all processing agreements. In February 1977, DOE issued a Notice of Proposed Rulemaking, in which it proposed to completely eliminate any SRB benefits for crude oil processed under a processing agreement. 42 Fed.Reg. 9394 (1977). The proposal was adopted on April 26, 1977, at 42 Fed.Reg. 21,269 (1977), but did not become

effective until June 1, 1977, in order to allow small refiners who had "legitimate" processing agreements to make other arrangements. *Id.* After May 1977, SRCI reported no further barrels as being processed for its account.

### C. The Administrative Proceedings

In August, 1979, DOE began an investigation into Champlin's participation in oil processing agreements with four small refiners, including SRCI. On July 20, 1982, DOE and Champlin executed a Consent Order and a side letter agreement, which constituted a comprehensive or global settlement of DOE's claims and potential claims against Champlin for alleged violations of petroleum price and allocation regulations for the period January 1, 1973, through January 27, 1981.

On December 15, 1986, after conducting audits of SRCI and TCC, DOE issued a Proposed Remedial Order ("PRO") to SRCI and TCC. The PRO alleged that SRCI had erroneously reported 613,270 barrels of crude oil as having been refined by Champlin for the account of SRCI, when in fact SRCI did not own or retain title to the oil. The PRO also alleged that TCC and SRCI engaged in practices which resulted in circumvention and contravention of the entitlements regulations and in the issuance of excess SRB entitlements worth $1,202,143. TCC filed a Statement of Objections, and an administrative proceeding was commenced before the Office of Hearings and Appeals ("OHA").

On June 30, 1989, the OHA granted a request by DOE to amend the PRO in order to allow DOE to proceed against TCC under an "animating force" claim of liability. Specifically, DOE charged that TCC should be held jointly and severally liable with SRCI as the "animating force" in SRCI's alleged reporting violations on its Monthly Refiners Reports.[2]

On October 7, 1991, OHA issued a Remedial Order ("RO") which held that SRCI had filed erroneous reports with DOE, and that the tripartite arrangement illegally used SRCI's small refiner status to reap unwarranted SRB benefits and perpetrate a fraud on the entitlements program. *Southwestern Refining Co. and the Crude Co.*, 21 DOE (CCH) ¶ 83,011 (1991). OHA also found that TCC was an "animating force" behind the violations and therefore was jointly and severally liable with SRCI and was required to refund to the government the approximately $1.2 million in illicit benefits, plus interest from the date of the violation.

TCC appealed the RO to the Federal Energy Regulatory Commission ("FERC"). Hearings were conducted before an ALJ, who issued a Decision and Proposed Order on March 12, 1993. *See The Crude Co.*, 62 FERC (CCH) ¶ 63,026 (1993). The decision affirmed the RO in all respects except that it imposed interest only from the date of the RO, not from the date of the violation.

On November 10, 1993, FERC issued its final decision. *See The Crude Company*, 65 FERC ¶ 61,214 (1993). FERC affirmed the RO in all respects, including reinstating interest from the dates of the violative conduct. In short, FERC held that, as a result of erroneously claimed SRB entitlements, TCC was jointly and severally liable with SRCI for $1,202,143.07, plus interest from the date of the transactions.[3] TCC then instituted this appeal.

## II. ANALYSIS AND DECISION

### A. The Trial on TCC's Claim of Right to Offset Against the Champlin Judgment

■ TCC claims that the amount which DOE recovered in its $14.1 million settlement with Champlin must be offset against DOE's claim against TCC because the claims released under the Consent Order and this action relate to common damages. To deny an offset, TCC contends, would be to allow DOE to obtain a double recovery for the

---

2. Previously, DOE had proceeded on the theory that TCC was liable as a "joint venturer" with SRCI.

3. Although SRCI was found to be jointly and severally liable with TCC, the government is no longer pursuing SRCI because SRCI is insolvent.

same injury.[4] TCC argues that, because the government did not specifically earmark the proceeds of the settlement among the various claims against Champlin, TCC is entitled to credit for the amount of the Champlin settlement. Such a credit would extinguish the government's $1.2 million claim against TCC, and obviate the government's claim for interest on the damages.

An evidentiary hearing was held on the offset issue. The Court heard testimony from numerous witnesses concerning the Champlin settlement. The specific issues addressed were: (1) the scope of the Champlin Consent Order; (2) whether the Champlin settlement and the current action relate to common damages; and (3) whether the proceeds from the Champlin settlement fully compensated the government for the total damages applicable to the tripartite transaction.[5]

Although the testimony indicates Champlin's negotiators considered the Consent Order to be a global settlement, it is clear from the face of the document that certain areas of potential liability were carved out from the agreement. It is undisputed that the Consent Order did not release Champlin from potential criminal liability based on certain pending "special investigations" which DOE was conducting, and that such "special investigations" included an investigation into Champlin's processing agreements with SRCI.[6] With regard to extinguishing civil liability, TCC claims that the Champlin Consent Order clearly settled all DOE's actual and potential civil claims against Champlin regarding the tripartite transaction. DOE counters that the Consent Order did not release Champlin from civil liability for the processing transactions since the Consent Order expressly excluded certain special investigations. The term "special investigation" is not defined within the Consent Order, but is defined in a separate side letter.[7]

Plaintiff presented evidence that the Consent Order released Champlin from all civil

---

**4.** The government concedes that the law prohibits a party from receiving double recovery for the same injury. *See Zenith Radio Corp v. Hazeltine Research, Inc.,* 401 U.S. 321, 348, 91 S.Ct. 795, 811, 28 L.Ed.2d 77 (1971).

**5.** Both parties put forth factual and legal arguments regarding the scope of the Consent Order and the issue of allocation of settlement proceeds. TCC claims that the government has, on at least four occasions, admitted that the Champlin Consent Order covered potential civil claims against Champlin arising from the tripartite transaction. TCC also claims certain legal arguments made by the government—e.g. the government's reliance on *United States v. Exxon Corp,* 773 F.2d 1240 (Temp.Emer.Ct.App.1985), *cert. denied* 474 U.S. 1105, 106 S.Ct. 892, 88 L.Ed.2d 926 (1986), discussed *infra*—should not be considered by this Court because the government never presented the arguments at the administrative proceedings. The government asserts that TCC waived the consent order issue by failing to raise or attempt to litigate the issue in the administrative proceedings.

TCC raised the offset issue for the first time at the final oral argument before the OHA. The OHA did not consider the offset issue in the RO. Previously, TCC had argued that DOE should have gone after Champlin instead of, or at least in addition to, TCC. When TCC raised the issue of offset, it asserted that the Consent Order expressly prevented DOE from pursuing civil and criminal claims against Champlin.

This Court previously held that plaintiff had not waived its right to make the offset argument on the grounds that the offset argument was raised during the administrative proceedings and is an affirmative defense to the United States' counterclaim in this action. Since the Court granted plaintiff the right to litigate an issue not fully explored at the administrative level, it will not preclude the government from introducing evidence pertinent to these issues or relying on relevant case law.

**6.** The Consent Order reads, in relevant part, as follows:

Based on the information and evidence made available to DOE during its audits, DOE expressly agrees that it will not seek or recommend any criminal fines or penalties for the period or matters covered by this Consent Order; provided, however, that DOE may refer to the Department of Justice any suspected willful violation of the Federal petroleum price and allocation regulations that has been or may be discovered in the course of DOE's currently pending special investigations.

Consent Order at ¶ 502.

**7.** In a separate side letter, the phrase "currently pending special investigations" was defined to include "pending special investigations relating to: ... Champlin's processing agreements during 1977, with ... Southwestern Refining Company." Letter from Milton C. Lorenz, Special Counsel, Economic Regulatory Commission, to William T. Smith, President, Champlin Petroleum Company (Gov't Exh. NN).

claims relating to the processing arrangements at issue here. Even accepting the government's argument that the scope of the Consent Order is limited by the text of a side letter not referred to in the Consent Order, a proposition this Court finds troubling, the evidence suggests that Champlin did indeed negotiate a global release of "civil" liability. The Consent Order allowed DOE to refer only "any suspected *willful violation* of the Federal petroleum price and allocation regulations" discovered during the special investigations. Champlin Consent Order at ¶ 502 (emphasis added). The language "willful violation" strongly suggests that DOE could refer only criminal matters to the Department of Justice.[8]

This Court need not definitively address whether the Consent Order encompassed Champlin's civil liability for matters arising out of its processing arrangements with TCC and SRCI. Even if the settlement did release Champlin from such civil liability, there is nothing to indicate that the Champlin Consent Order released TCC from liability or that any part of the settlement proceeds were specifically allocated to the claims at issue here.

TCC states that the government's failure to include as part of the settlement any allocation of the $14.1 million towards the SRCI claim requires that TCC be given a credit for the full amount of the alleged violation (i.e. $1.2 million). In support of its position, TCC cites several cases where courts have held that a non-settling defendant is entitled to an offset based on another party's non-specific settlement on the basis that plaintiff would receive a double recovery by not allocating the proceeds of its settlement. *See, e.g., Hess Oil Virgin Islands Corp. v. UOP, Inc.,* 861 F.2d 1197 (10th Cir.1988) (where plaintiff brought suit against several defendants claiming damages arising out of an oil refinery fire); *In re LendVest Mortgage, Inc.,* 123 B.R. 623 (Bankr.N.D.Cal.1991) (involving a bankruptcy trustee's attempt to recover a preferential transfer from one party after settling with another party regarding the same preferen-

tial transfer); *Gulfstream III Assoc., Inc. v. Gulfstream Aerospace Corp.,* 995 F.2d 425 (3d Cir.1993) (involving a suit asserting three claims against seven defendants).

The cited cases are factually distinguishable from the instant case. They involved limited injuries and allegations by the plaintiff that defendants were jointly liable. They did not address allocation in the case of a global settlement where a variety of divergent claims were settled. The Champlin Consent Order involved such a global settlement. It settled numerous claims arising out of many different transactions. The settlement proceeds were not allocated to any specific claim.

The total amount of the claims charged by the government far exceeded the amount of the settlement. As often happens in a global settlement, the government settled for much less than the value it placed on the claims it was asserting. Here, some $500 million of claims was settled for $14.1 million. At no time has DOE specifically charged Champlin with the violations it has alleged against SRCI and TCC. Champlin is not a party to the SRCI–TCC proceeding. As such, there is no basis to hold Champlin jointly liable with SRCI and TCC.

Much more factually on point, and binding on this Court, is *United States v. Exxon Corp.,* 773 F.2d 1240 (Temp.Ct.Emer. App.1985), *cert. denied,* 474 U.S. 1105, 106 S.Ct. 892, 88 L.Ed.2d 926 (1986). There, the Court found that rights under certain global consent orders "accrued solely to the settling parties." *Id.* at 1276. The *Exxon* case involved a claim by DOE that Exxon, an operator of a unitized oil field, was liable under the "animating force" theory for certain overcharges. Several of the other parties, who had received a share of the overcharges from Exxon, entered into global consent orders with DOE wherein the government released certain claims it had against the settling parties. Exxon, like TCC in this case, asserted that DOE was seeking a double recovery and that its liability should be reduced by the amount DOE received in settlements

---

**8.** In addition, several witnesses testified at trial that the term "special investigations" was com-

monly understood to refer to criminal investigations.

from the other parties involved in the transaction.

The Court of Emergency Appeals (TECA) rejected Exxon's claim that it was entitled to an adjustment in its liability on account of the settlements made between the government and others who were not parties to the case. *Id.* at 1277. TECA based its conclusion in part on certain factual considerations, nearly all of which are present in this case. They included the following: (1) Exxon was not a party to the settlement; (2) Exxon did not pay any sum of money to the government for release of any Exxon liability under the settlements; (3) Exxon was not mentioned in the consent order; (4) the consent orders did not mention the particular unitized field at issue in the litigation or the litigation itself, which was pending at the time the consent orders were executed; (5) the consent orders did not purport to release the settling parties from suits by private parties or for their liability to other parties for contribution, indemnification, unjust enrichment or other relief; (6) none of the settling parties sought to intervene in the *Exxon* case; (7) there was no finding that the settling parties authorized Exxon to assert rights on their behalf; (8) Exxon had been found to be the "animating force" responsible for the crude oil pricing violations; and (9) Exxon's liability was not dependent on the finding of "joint liability" on the part of third parties who were not defendants in the action, or upon proof of Exxon's right to contribution or indemnity from those third parties. *Id.* at 1276–77.

As in the *Exxon* case, TCC was not a party to the Champlin settlement and did not pay any money to either Champlin or DOE under the settlement.[9] TCC was not mentioned in the Consent Order, and it did not release TCC from liability. Champlin has not sought to intervene in this action, nor has Champlin authorized TCC to assert Champlin's rights on its behalf. TCC's liability under the "animating force" concept is not dependent on a finding of joint liability with Champlin, or upon proof of TCC's right to contribution or indemnification from Champlin.[10]

To hold that TCC should benefit from the global consent DOE reached with Champlin—where TCC was not a party and did not contribute to the settlement—would be to give TCC, a party found to be a violator of this nation's energy laws, an unintended and unconscionable windfall. Such a finding would discourage the government from entering into global settlements, since the government would thereafter be foreclosed from proceeding against any other party involved in any transactions with the settling parties. The government's only other option in pursuing global settlements would be to allocate the proceeds, often a difficult if not impossible task.

Government agencies must be given a certain amount of latitude in recapturing ill-gotten gains from those who violate the law. Any party alleging that the government will receive double recovery has the burden to substantiate its claim. It must bear the risk of uncertainty, particularly where the claimant has been found to have violated the law and seeks to be absolved from repaying its ill-gotten gains. Under controlling precedent—*see United States v. Exxon Corp.*, 773 F.2d 1240—it is clear that rights under the Champlin Consent Order accrued solely to Champlin, and not to TCC or SRCI. Accordingly, the Court finds that TCC is not entitled to a credit against the violation amount based on Champlin's settlement with DOE.[11]

9. TCC's claim that it is entitled to the benefit of the Champlin settlement is based on the equitable concept that the government would obtain double recovery if TCC did not receive an offset for the money paid by Champlin to the government. TCC ignores the fact that it would receive a windfall by obtaining an offset since it has no intention of making any contribution to Champlin for the benefit it wants to obtain from Champlin's payment to the government.

10. Of the relevant considerations TECA cited, the only one not present in this case is the fact that the litigation at issue in *Exxon* was pending at the time of the settlements, while this case was not filed (nor did DOE issue its RO against TCC) until well after the Champlin Consent Order was executed. The Court does not view this factual discrepancy as sufficiently relevant to counter all of the many factual similarities cited above.

11. The above represents the Court's findings of fact and conclusions of law on this issue.

B. *The Motion for Summary Judgment as to the Remaining Counts*

The remaining issues are before the Court on cross motions for summary judgment. As noted above, TCC has asserted both procedural and substantive challenges to the administrative decision.

1. *Standard of Review*

■ This action is here on plaintiff's appeal from DOE's final Remedial Order. Plaintiff asks this Court to find that there is no standard which this Court may apply to review the administrative record and that therefore the administrative decision should be invalidated. In the alternative, TCC requests that this Court adopt a *de novo* standard of review.

Plaintiff argues that Congress, in enacting the 1992 revision of the Economic Stabilization Act ("ESA"), repealed the standard of judicial review of DOE administrative actions, leaving no basis for this Court to review DOE's administrative decision. The 1992 revision eliminated § 211(b) through § 211(h) of the ESA.[12] One of the eliminated sections, § 211(d)(1) of the ESA, prohibited any court from setting aside an agency's order unless the court determined that the order was "in excess of the agency's authority" or was based upon findings "not supported by substantial evidence." Pub.L. 92–210, § 211(d)(1) (85 Stat.) (Dec. 22, 1971). TCC asserts that Congress's repeal of § 211(d)(1) effectively vitiated the statutory scheme for DOE's administrative enforcement proceedings, thereby requiring the administrative decision in this case to be set aside. Alternatively, plaintiff argues that *"de novo"* is the proper standard of review since the administrative decisions were based on documentary evidence, not live testimony, and thus credibility was not an issue at the administrative proceeding level.

The Court does not agree, and finds that "substantial evidence" is the proper standard of review. First, the Court notes that "substantial evidence"—rather than *de novo* review—accords proper deference to administrative determinations and is the standard used in virtually all judicial reviews of agency decisions. *De novo* review is usually reserved for appellate review of legal determinations, while factual determinations generally are reviewed under a "substantial evidence" or some similar deferential standard.

Second, it is far from clear that Congress intended to abolish the "substantial evidence" standard. The legislative history to the 1992 revisions suggests that Congress intended merely to abolish TECA and transfer jurisdiction to the federal circuit. Had Congress wanted to vitiate all administrative enforcement proceedings by DOE it would have done so directly.

Third, the initial administrative review at issue here was conducted prior to the repeal of § 211(b). The substantial evidence standard was clearly in effect at the time of the initial administrative hearing. Fourth, § 5(a)(1) of the Emergency Petroleum Allocation Act of 1973 ("EPAA"), 15 U.S.C. § 754, has not been repealed and remains in effect. This section incorporates § 211(d)(1) of the ESA, which provides for the "substantial evidence" standard of review. 15 U.S.C. § 754(a)(1).

Fifth, and finally, the EPAA standard of "substantial evidence" was applied by the TECA and approved by the Federal Circuit after § 211(b) had been stricken from the ESA. *See MAPCO Int'l, Inc. v. FERC,* 993 F.2d 235 (Temp.Emer.Ct.App.1993), *suggestion for rehearing en banc denied,* No. T–DC 120–119 (Fed.Cir.1993); *Texas American Oil Corp. v. United States Dep't of Energy,* 44 F.3d 1557, 1561 (Fed.Cir.1995). Accordingly, the "substantial evidence" standard of review remains in effect.[13]

---

**12.** The ESA appears at 12 U.S.C. § 1904 note (1976 ed.). In its 1992 revision, Congress transferred exclusive appellate jurisdiction over ESA matters from TECA to the United States Court of Appeals for the Federal Circuit. *See* Pub.L. 102–572, 106 Stat. 4506 (October 29, 1992).

**13.** The case presented by DOE is sufficiently strong to meet plaintiff's suggested *de novo* standard.

### 2. DOE's Authority to Adjudicate the Claim Against TCC

TCC asks this Court to set aside the RO on the ground that OHA lacked the authority to adjudicate TCC's liability as an "animating force" behind the violation. Specifically, TCC argues that DOE's "animating force" theory of liability is based on common law principles of tort and agency, and thus must be tried before a jury by an Article III court. To bolster its argument, TCC points to the Seventh Amendment right to a jury trial and attempts to characterize this action as an action at law which does not involve vindication of public rights.

Plaintiff mischaracterizes the action. Notwithstanding the DOE's reliance on concepts developed at common law in advocating its "animating force" theory of liability against TCC, this case is clearly one vindicating public rights. Through these proceedings, DOE seeks to enforce a nationwide program of petroleum price controls that were implemented in response to a "national energy crisis," which Congress deemed severe enough to threaten "the public health, safety, and welfare." *See* 15 U.S.C. § 751(a)(3). Enforcement of a program designed "for the purpose of minimizing the adverse impacts of such [energy] shortages or dislocations on the American people and the domestic economy," 15 U.S.C. § 751(b), plainly is in the public interest. Moreover, in this action, DOE is enforcing the price control regulations pursuant to § 209 of the ESA. TECA has expressly held that "[a]ctions by the United States under ESA § 209 are taken to enforce public, not private rights." *Citronelle–Mobile Gathering, Inc. v. Edwards,* 669 F.2d 717, 722 (Temp.Emer.Ct.App.1982), *cert. denied,* 459 U.S. 877, 103 S.Ct. 172, 74 L.Ed.2d 141 (1982).

The law is clear that Article I courts and administrative bodies may adjudicate any case involving public rights. The Supreme Court has held that:

> [a]t least in cases in which "public rights" are being litigated—e.g., cases in which the Government is sued in its sovereign capacity to enforce public rights created by statutes within the power of Congress to enact—the Seventh Amendment does not prohibit Congress from assigning the fact-finding function and initial adjudication to an administrative forum with which the jury would be incompatible.

*Atlas Roofing Co., Inc. v. Occupational Safety and Health Review Comm'n,* 430 U.S. 442, 450, 97 S.Ct. 1261, 1266, 51 L.Ed.2d 464 (1977). *See also Joy Technologies, Inc. v. Manbeck,* 959 F.2d 226, 228 (Fed.Cir.1992) (holding that "cases involving 'public rights' may constitutionally be adjudicated by legislative courts and administrative agencies without implicating the Seventh Amendment right to a jury trial"). Accordingly, administrative adjudication in the first instance is appropriate.[14]

What is more, because the government in this case is seeking merely a disgorgement of ill-gotten gains, no jury is required. The government is not seeking to impose a penalty, but merely to obtain restitution, which is an equitable remedy. There are no allegations of criminal responsibility or civil detriment involved here. What is involved is money that was wrongfully taken. That money, plus interest, must be paid back.

### 3. FERC's Adjudicatory Procedures

TCC complains that the ALJ's filing with FERC a Certification of Proposed Or-

---

**14.** This Court's finding that DOE had authority to conduct the initial adjudication is strengthened by Congress' express assignment to DOE of the initial adjudication of alleged violations of price control regulations. *See* 42 U.S.C. § 7193(a). TCC points out that this statute was not made effective until October 1, 1977, after the events in issue here had already occurred. However, the statute was passed well before DOE issued its RO in this case. Moreover, Congress' decision to give DOE express authority to issue remedial orders does not automatically mean that the agency lacked the authority prior to passage of the provision. Courts have held both expressly and impliedly that the Federal Energy Administration (FEA), DOE's predecessor, had power to issue remedial orders before October 1977. *See Getty Oil Co. v. Dep't of Energy,* 478 F.Supp. 523, 527, n. 4 (C.D.Cal. 1978) (holding the FEA had authority to issue a remedial order in September, 1976, despite plaintiff's contention that FEA had no such power until passage of 42 U.S.C. § 7193 expressly authorized DOE to issue remedial orders); *see also Sauder v. Dep't of Energy,* 648 F.2d 1341 (Temp.Emer.Ct.App.1981) (affirming a RO issued on November 4, 1976, which held plaintiff liable for crude oil overcharges).

der ("CPO") which was not made available to TCC constituted secret action in violation of TCC's due process rights. In response, DOE contends that Congress specifically contemplated, and condoned through passage of the Administrative Procedure Act, the idea that ALJs could serve both as a hearing officer and also as a draftsman and advisor to the employing agency and that, even if the procedure was improper, plaintiff has not been harmed.

Whether the practice by which an ALJ submits an unpublished recommendation elaborating on an earlier proposal is wise or unwise is immaterial because there is no evidence that TCC was adversely affected by this procedure. The CPO was virtually identical to the Decision and Proposed Order, a document which was made available to TCC. Thus, TCC had ample opportunity to address the issues raised in the CPO before FERC issued its final decision.

The only substantive area in which FERC differed from the decision recommended by the ALJ was in the award of prejudgment interest. FERC's decision to award prejudgment interest does not so much show lack of deference to the ALJ, but rather indicates appropriate deference to TECA. In the intervening time between the ALJ's issuance of his D & PO and FERC's final decision, TECA had issued its decision in *MAPCO Int'l, Inc. v. FERC*, 993 F.2d 235, 247 (Temp.Emer.Ct.App.1993), declining to reduce interest because of administrative delay. FERC cited the *MAPCO* case in support of its decision to reverse the decision of the ALJ with respect to prejudgment interest. 65 FERC ¶ 61,214. The Court finds no basis to disturb FERC's decision on this ground.

4. *TCC's Claim That SRCI Properly Reported the Crude Oil Processed for its Account and That Any Determination to the Contrary Requires DOE to Engage in Retroactive Rulemaking*

■ TCC maintains that, even if reporting violations by SRCI are attributed to TCC,

TCC cannot be liable for reporting violations because SRCI properly reported the crude oil processed for its account on the Refiners' Monthly Report ("RMR") Form. TCC further claims that DOE's determination that SRCI improperly reported the crude oil processed under the tripartite arrangement depends on an interpretation of the regulations which was not prevalent at the time the RMRs were actually filed. Thus, TCC argues, DOE is engaging in retroactive rulemaking.

Under the reporting regulations in effect at the time, refiners were obligated to report the volume of crude oil which was processed by another refiner for the account of that refiner pursuant to a processing agreement. 10 C.F.R. § 211.67(d)(1)(i). Processing agreements were defined as: "any agreement to which *an owner* of crude oil agrees to have that crude oil processed or refined by another person and retains ownership in some or all of the petroleum products so processed or refined from the crude oil." 10 C.F.R. § 211.62 (emphasis added).

On the forms submitted, SRCI reported that Champlin had refined 613,000 barrels of crude oil "for the account" of SRCI. FERC held that this manner of reporting was improper because SRCI did not "own" the crude oil or retain any "ownership" in the refined products. Plaintiff claims that SRCI was the owner since it held legal title to the crude oil, and thus SRCI properly completed the RMRs.

■ DOE must look beyond the form of a transaction "to the economic substance, in order to further the regulatory purpose of Congress." *Getty Oil Co. v. Dep't of Energy*, 749 F.2d 734, 737 (Temp.Emer.Ct.App.1984). There was substantial evidence to support DOE's conclusion that the transaction at issue here was a sham designed solely to obtain SRB entitlements, and that TCC, not SRCI, was at all times the true owner of the crude oil and refined products.[15]

---

15. For example, based on evidence presented, OHA found that TCC, not SRCI, had the "sole authority to procure the crude oil, to administer

the processing agreement with Champlin, to pay the processing fees, ... to dispose of the refined products ...[,] and to set prices for the purchase

TCC further argues that—by claiming that SRCI violated the reporting regulations by reporting the 613,000 barrels processed by Champlin as being processed for SRCI's account—DOE is engaging in retroactive rulemaking. The gravamen of plaintiff's argument is that it was not until June 1977, after the reporting period for which TCC is now charged with violations, that DOE eliminated SRB entitlements for all processing agreements. TCC alleges that the 1976 regulation in effect at the time prohibited the issuance of SRB benefits only for a specific type of processing transaction—i.e. where the crude oil processed pursuant to the agreement was purchased from and the refined products sold to the refiner who processed the crude—which is not the type of transaction at issue in this case.

Plaintiff's argument is without merit. Far from constituting retroactive rulemaking, DOE's analysis was a legitimate application of regulations and statutory provisions in effect at the time of the reporting violations. Plaintiff is correct that the claiming of SRB benefits based on the particular tripartite arrangement at issue here was not expressly prohibited at the time the RMRs were submitted. However, the mere fact that something is not expressly prohibited does not, *ipso facto*, mean that it is permitted. It would be ludicrous to hold that DOE's decision to specifically outlaw certain practices served to legitimize all other transactions not expressly forbidden. Indeed, the Supreme Court has recognized that an agency may promulgate standards of conduct "on a case-by-case basis" through adjudication, and is not limited to rulemaking as its sole means of administering a statute. *See SEC v. Chenery Corp.*, 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947).

of the crude oil and the sale of the refined products." *Southwestern Refining Co., Inc. and The Crude Co.*, 21 DOE (CCH) ¶ 83,011 (1991). DOE also found that "SRCI at no time handled or directed or had an opportunity to assume possession or control of the crude oil or refined products, and the refined products at no time entered SRCI's existing distribution and marketing system." *Id.* In short, DOE found that the agreements shielded SRCI from any risk of loss with respect to the crude oil. *Id.*

The Court also rejects the implication that, because the entitlements at issue were not expressly forbidden, it is unfair to TCC to charge a reporting violation. The comment to the 1976 regulation stated DOE's intent to deny SRB benefits to refiners who entered into processing agreements solely to obtain entitlements, 41 Fed.Reg. 9391, 9393 (1976). DOE thus served notice on TCC that it would be improper to seek SRB benefits under the tripartite arrangement at issue here. DOE is not now attempting to impose penalties on TCC, but merely is seeking disgorgement of wrongfully obtained benefits.

Plaintiff also argues that there is an inconsistency between DOE's current interpretation of "owner" and the contemporaneous use of the term on the reporting form for the period of January–May 1977, and that this inconsistency demonstrates that DOE is now engaging in retroactive rulemaking. To understand plaintiff's argument requires a review of the applicable reporting requirements, regulations, and definitions.

Refiners were required to report how much crude was processed pursuant to a processing agreement. In addition, the RMRs contained a line item (Line 40399) requiring the reporting of the volume of crude processed by a large refiner for the account of a small refiner under a processing agreement of the type specifically excluded from SRB benefits by the 1976 revision.[16] The 1976 revision expressly precludes refiners from obtaining SRB entitlements for:

> any volume of a small refiner's crude oil runs to stills *attributable to a processing agreement* for the account of that small refiner with another refiner where the crude oil processed pursuant to that processing agreement is purchased from and the refined products produced under that

16. The regulation provided as follows:

> Each small refiner shall separately identify in its reports filed pursuant to [10 C.F.R. § 211.66(h)] of this subpart any volumes of its crude oil runs to stills not eligible (under the provisions of paragraph (e)(2) of this section) for small refiner bias entitlements.
> 10 C.F.R. 211.67(e)(3).

agreement are sold, directly or indirectly, to that other refiner.

10 C.F.R. § 211.67(e)(2) (emphasis added). A "processing agreement," in turn, is defined as "any agreement to which *an owner* of crude oil agrees to have that crude oil processed or refined by another person and retains ownership in some or all of the petroleum products so processed or refined from the crude oil." 10 C.F.R. § 211.62 (emphasis added).

TCC claims that, under DOE's current interpretation of "owner" as excluding one who holds legal title but does not direct the flow of crude oil, the type of transaction described in the 1976 revision could not qualify as a processing agreement because the small refiner would not "own" the crude oil. There is no inconsistency as TCC suggests. A small refiner who purchased crude oil from a large refiner and sold the processed product back to the large refiner could be deemed to have both directed the flow of the oil and actually owned the oil, even though the product was refined by the large refiner. This type of arrangement—i.e. one that was not purely a sham paper transaction—would have been required to be reported on Line 40399. Since there is no inconsistency between DOE's interpretation of "owner" and the contemporaneous instructions for filling out the RMRs, TCC's attempt to create the appearance of retroactive interpretation or rulemaking fails.

### 5. *TCC'S Reliance on Advice of Counsel*

█ Plaintiff contends that its reliance on advice of experienced energy counsel establishes a good faith defense to the charges. Plaintiff's contention is without merit on both factual and legal bases. The record is not clear as to the factual predicate upon which counsel's advice was based. Plaintiff's claim that its counsel, in rendering his opinion, relied on advice received from an assistant general counsel at DOE also is not fully supported by the record. The finding reached by the Office of Hearings and Appeals on this issue is pertinent:

[W]e are not convinced that agency officials were given an accurate description of the true nature of the proposed arrangements between TCC, SRCI and Champlin when they were approached for informal advice by TCC's expert legal consultant, Robert E. Montgomery. In Mr. Montgomery's declaration submitted in this proceeding, his description of TCC's and SRCI's activities apparently reflect what he was told by TCC officers concerning the proposed arrangements and creates the impression that SRCI was an active partner in the processing agreements arranged by TCC with Champlin and that these agreements had real economic significance.... TCC could not expect to receive accurate advice from expert counsel or FEA officials who were furnished with misleading or incomplete information.

21 DOE ¶ 83,011 n. 3. The record does not support plaintiff's factual assertions on this issue.

At best, discussions between plaintiff's counsel and DOE counsel were oral. Nothing was committed to writing. To bind the government on the basis of an oral conversation would not be in keeping with the prudent operations of our government agencies and not in the public interest. Certainly the private sector is entitled to discuss matters with government representatives. In the interest of all parties, reliance is only justified where the advice provided by the government official is uncontroverted. To assure such a result, reliance on oral discussions must be discouraged. The more prudent course to pursue would be to commit the discourse to an unambiguous writing. Anything less is not of much value.

█ On the legal issue, plaintiff fares no better. A lawyer's advice cannot absolve a client from repaying monies obtained wrongfully. Government officials are the only persons who ultimately have the responsibility to enforce government laws. Here, DOE officials determined that SRB entitlements were wrongfully obtained. This determination is entitled to deference and cannot be overridden by the advice of private counsel that the transaction was legal.

At most, good faith reliance on the advice of counsel goes to the question of criminal intent where that is an issue in the case.

There are no allegations of criminal culpability here. What is at issue is the government's attempt to recoup money that was wrongfully received. Money so received must be disgorged.

### 6. *Joint and Several Liability Based on the "Animating Force" Theory*

 Plaintiff challenges FERC's finding that TCC is liable for the reporting violations as an "animating force" of those violations. In holding TCC liable, FERC applied the two-pronged test for "animating force" liability established in *Citronelle–Mobile Gathering, Inc. v. Herrington,* 826 F.2d 16 (Temp.Emer.Ct.App.1987), *cert. denied* 484 U.S. 943, 108 S.Ct. 327, 98 L.Ed.2d 355 (1987), and *Sauder v. Dep't of Energy,* 648 F.2d 1341 (Temp.Emer.Ct.App.1981). Under this test, a party will be liable as an animating force or central figure if it is shown that (1) the party exercised personal control of the firm's regulated operations or participated in the transactions in which the overcharges occurred; and (2) the party personally benefitted from the overcharges.

The Court rejects plaintiff's argument that there is no legal foundation for the application of the "animating force" theory of liability to the present case, and finds that FERC properly applied the test to TCC. FERC's conclusion that TCC is liable as an animating force is based on findings supported by substantial evidence. There is ample factual support in the record to conclude that TCC actively participated in the transactions. From obtaining Champlin's agreement to process the oil, to delivering the crude directly to Champlin and taking possession of the refined products, TCC was intimately involved in the transactions. That TCC did not personally fill out the monthly reports cannot absolve it from liability.

### 7. *Liability Based On the Anti–Circumvention Provision*

In addition to DOE's claim that TCC participated in a violation of the reporting regulations, DOE asserts a separate and independent theory of liability against TCC: namely, that TCC circumvented the entitlements regulations by participating in the tripartite arrangement, in violation of the anti-circumvention provision. The anti-circumvention provision states that: "[a]ny practice that circumvents or contravenes or results in a circumvention or contravention of the requirements of any provision of this chapter or any order issued pursuant thereto is a violation of the DOE regulations stated in this chapter." 10 C.F.R. § 205.202. DOE maintains that this provision establishes TCC's liability even absent a finding that plaintiff participated in a violation of the reporting regulations.

 TCC argues that FERC's decision that TCC violated the anti-circumvention provision is in error for three reasons: (1) the anti-circumvention provision is not a "stand-alone" provision which provides a basis for liability absent the violation of some other, substantive allocation or pricing regulation; (2) the anti-circumvention provision does not give sufficient notice of what acts are prohibited by the provision and thus is unconstitutionally vague; and (3) TCC had no unlawful intent, as evidenced by its having obtained advice from expert energy counsel.

 The Court sustains DOE's position. As to the first theory, DOE's interpretation of its own regulation is entitled to great deference. *See Thriftway Co. v. Dep't of Energy,* 867 F.2d 1577, 1580 (Temp.Emer.Ct.App.1989); *Pennzoil Co. v. Dep't of Energy,* 680 F.2d 156, 170 (Temp.Emer.Ct.App.1982), *cert. dismissed,* 459 U.S. 1190, 103 S.Ct. 841, 74 L.Ed.2d 1032 (1982). Here, FERC's finding a violation of the anti-circumvention provision was clearly sustainable. The arrangement had no economic basis and was entered into for the sole purpose of circumventing government regulations.

DOE's position that the anti-circumvention provision is a "stand alone" provision finds support in federal court precedent. In concluding that § 205.202 was a "stand alone" provision, the ALJ relied on *United States v. Sutton,* Fed. Energy Guidelines Court Decision 1981–84 ¶ 26,490 at 29,558 n. 6 (N.D.Okla.1984), *aff'd,* 795 F.2d 1040 (Temp.Emer.Ct.App.1986), *cert. denied,* 479 U.S. 1030, 107 S.Ct. 873, 93 L.Ed.2d 828

(1987), in which the Court indicated that it was not necessary to find a violation of another regulation in order to find a violation of § 205.202. 62 FERC ¶ 63,026 (noting that the *Sutton* decision was binding on FERC). Also relevant to the issue of whether the anti-circumvention regulation provides an independent basis for liability is *McWhirter Distrib. Co. v. Texaco, Inc.*, 668 F.2d 511 (Temp.Emer.Ct.App.1981). In *McWhirter*, TECA held that the "normal business practices" rule (10 C.F.R. § 210.62(a))—which is substantively similar to the anti-circumvention regulation—did not depend upon finding a direct or indirect violation of the allocation or price rules.[17] *Id.* at 523.

Common sense dictates that the government need not demonstrate a violation of a separate regulation in order to support liability under § 205.202. As noted in the RO, the anti-circumvention provision was "specifically designed to prevent firms from doing indirectly what they were otherwise prohibited from doing directly." 21 DOE ¶ 83,011. To hold that § 205.202 created liability only where there was an independent basis for liability would render the provision redundant and "turn the broad purpose [of the regulation] on its head." *Id.*

Nor does the Court agree that § 205.202 is Constitutionally void for vagueness, as TCC asserts in its second argument. The record indicates that DOE gave sufficient notice that SRB entitlements were unavailable for TCC–SRCI–Champlin type transactions. DOE made clear to all that the purpose of its regulations was "to prevent refiners from entering into processing agreements ... for no valid business purpose other than obtaining a portion of the benefits of the small refiner bias." 41 Fed.Reg. 9391, 9393 (1976).

As to TCC's third argument, reliance on advice of counsel that the transactions were not illegal does not insulate TCC from liability under the anti-circumvention provision. DOE found that TCC intended to circumvent the entitlements program, a conclusion which this Court finds to be supported by substantial evidence. TCC gets no solace from its position that it cannot be held accountable for violating the anti-circumvention provision because it relied on the advice of counsel. As stated above, private counsel does not have the ultimate responsibility for enforcing the law. To hold otherwise would create chaos. The fact is that the government found there was a sham transaction. Counsel's advice cannot make it "sham-less."

### 8. *DOE'S Claim for Equitable Restitution*

DOE's power to order TCC to refund monies improperly obtained is based on § 209 of the ESA. This power to effect restitution is equitable in nature, and "is usually thought of as a remedy by which [a] defendant is made to disgorge ill-gotten gains or to restore the status quo, or to accomplish both objectives." *Sauder v. Dep't of Energy*, 648 F.2d at 1348. Another objective of restitution is "to set things right." *Id.*

Plaintiff maintains that the relief which FERC awarded against TCC was demonstrably based neither on "disgorgement of ill-gotten gains" nor "restoring the status quo," and thus cannot be deemed equitable "restitution" within the meaning of § 209 of the ESA. In support of its claim, TCC makes several, more specific arguments.

First, plaintiff asserts that—because DOE has not rebutted TCC's expert testimony that the bulk of the value of the entitlement benefits went to Champlin and has failed to show how the three parties divided the benefits—DOE has not met its burden of proof in showing that TCC was unjustly enriched. This argument is without merit. TECA has made clear that the government's recovery is not limited to the amount which a

---

**17.** TCC attempts to convince the Court that reliance on *McWhirter* is misplaced in this case since the *McWhirter* Court based its decision in part on a preamble to the "normal business practices" rule, a preamble not found in the anti-circumvention provision. The absence of a preamble does not render *McWhirter* immaterial to this case, especially since the preamble was not the sole basis for TECA's decision. As TCC concedes elsewhere in its briefs, the substantial similarities in the two provisions make a judge's reading of § 210.62 pertinent authority for construction of the anti-circumvention regulation.

wrongdoer can be shown to have been enriched by that wrongdoing. *See United States · v. Sutton*, 795 F.2d 1040, 1063 (Temp.Emer.Ct.App.1986), *cert. denied*, 479 U.S. 1030, 107 S.Ct. 873, 93 L.Ed.2d 828 (1987) (holding that "[a] person who is the 'animating force' for regulatory violations is fully liable even though he does not personally receive all benefits of his illegal activities").

[19] Second, TCC argues that requiring TCC to pay DOE the full amount of damages awarded does not restore the status quo because DOE has not recast the transactions as they would have been if TCC had been considered the owner of the crude oil. TCC maintains DOE focused only on the benefits which flowed from the program as a result of the tripartite arrangement, while disregarding the benefits flowing to the program from the same processing transactions.[18] Accordingly, TCC argues, FERC failed to determine the true effect of the transactions at issue upon the entitlements program. TCC's specific argument has been rejected by OHA in decisions affirmed by TECA and by FERC. *See Thriftway Co. v. Dep't of Energy*, 14 DOE (CCH) ¶ 83,014, *aff'd*, 39 FERC ¶ 61,017 (1987), *aff'd*, 920 F.2d 23 (Temp.Emer.Ct.App.1990); *Morrison Petroleum Co.*, 55 FERC ¶ 63,004 (1991), *aff'g* 18 DOE (CCH) ¶ 83,014 (1989). There is substantial evidence to support FERC's finding. This Court finds that DOE's determination of the amount of restitution due is reasonably calculated to approximate the total amount of benefits which the parties improperly received pursuant to the processing arrangements.[19]

Third, TCC asserts that payment of the award to DOE does not restore the status quo because the restitution is not going to the injured parties, i.e. the other refiners who participated in the entitlements pro-

gram. This argument also must fail. TECA has expressly held that restitution may be paid to DOE even if it is not directly passed to injured consumers. *United States v. Exxon*, 773 F.2d at 1286 (Temp.Emer.Ct. App.1985). A wrongdoer must disgorge ill-gotten gains. To go through the process suggested by TCC would render an enforcement agency "toothless."

### 9. *TCC's Claim of Undue Delay by DOE in Bringing the Enforcement Action*

TCC contends that DOE unduly and unreasonably delayed in bringing and adjudicating the enforcement action against it. As a result of this delay, TCC contends that the current action is barred by both the statute of limitations and the equitable doctrine of laches. Alternatively, TCC asserts that equity requires at a minimum that the pre-judgment interest charged against TCC be reduced or eliminated. The Court does not agree.

TCC maintains that DOE's issuance of an amended PRO in June 1989 constituted commencement of a new action, and that the new action was barred by the Petroleum Overcharge Distribution Act of 1986 ("PODRA"), 15 U.S.C. § 4504. PODRA provides that "the commencement of a civil enforcement action shall be barred unless such action is commenced before the later of (A) September 30, 1988; or (B) six years after the date of the violation upon which the action is based." 15 U.S.C. § 4504(a)(1). The ALJ, in a decision upheld by FERC, found that the amendment "relates back" to the date the PRO was issued (December 15, 1986). He found that the amended PRO does not constitute a new action, and accordingly is not barred by PODRA. 62 FERC ¶ 63,020; 65 FERC ¶ 61,214. The ALJ and

---

**18.** For example, TCC points out that DOE has not considered the fact that some of what the other refiners participating in the entitlements program lost as a result of the entitlements obtained through the tripartite arrangements may have been recouped through slightly higher prices for the refined products. Similarly, TCC asserts, the $1.2 million award does not take into account the fact that some of the entitlement benefits which SRCI earned would have been

offset by entitlement obligations which SRCI incurred by purchasing the barrels of crude oil from TCC.

**19.** The restitution award at issue here is based on the number of SRB entitlements which the parties earned as a result of the tripartite transactions multiplied by the value of such entitlements.

FERC correctly analyzed the applicable statute of limitations and properly concluded that PODRA does not bar this action. *Id.*

■ The decision to reject TCC's laches defense was within FERC's authority and supported by substantial evidence. The standard articulated in PODRA contemplates that an enforcement action could be brought more than six years after the events at issue. TCC's contention that it was unfairly prejudiced by DOE's failure to bring the action until after the entitlements program ended is without merit.

As evidence of unfair prejudice, TCC claims that a loss of evidence prevented it from proving: (1) that Champlin received most if not all of the benefits from receipt of SRB entitlements; and (2) that the scope of the Champlin Consent Order was sufficiently broad as to release Champlin from all civil liability to DOE based on the tripartite processing arrangement at issue here. As discussed elsewhere in this opinion, neither of these issues is determinative of TCC's liability. Therefore, it cannot be said that TCC has been unfairly prejudiced by the delay.

The Court also notes that equity does not support application of the laches defense in this case. The evidence shows that TCC was involved in a sham transaction designed solely to obtain SRB benefits to which the parties involved in the transaction were not entitled. As noted by the ALJ, "a finding of laches would result in condoning transactions which were nothing more nor less than shams ... [and] permit TCC to keep its share of the excess SRB entitlements." 62 FERC ¶ 63,026.

■ The Court also rejects TCC's claim that DOE's delay in bringing the enforcement action precludes the award of any prejudgment interest against TCC. In addition to the reasons cited in rejecting TCC's laches defense, which also are pertinent here, the Court notes that TECA has ruled that "[a]n award of prejudgment interest in an RO is certainly not in excess of the agency's authority" and can be overturned only if the order was based upon findings not supported by substantial evidence. *MAPCO Int'l, Inc. v. FERC,* 993 F.2d 235, 248 (Temp. Emer.Ct.App.1993) (rejecting this Court's decision to reduce interest on the grounds that the government had unduly delayed prosecution). Because the Court finds that FERC's finding was based upon substantial evidence, this Court will uphold the decision.

Imposition of prejudgment interest in this case does not lack equity. TCC has had the use of monies received under the tripartite processing arrangement for nearly 20 years. Further, TCC has had the use of the more than $1.2 million it owes in restitution during the entire pendency of this action. Money has a "time value," and unless TCC is required to include the time value of money in the amount of its liability, there will not have been full disgorgement of ill-gotten gains.

### III. CONCLUSION

TCC has asserted numerous reasons, some quite creative, why it should not be held liable. However, even the best legal representation and most inventive arguments cannot mask the fact that TCC engaged in sham transactions designed solely to obtain SRB benefits to which the parties were not entitled. The Court will grant judgment for defendants on all counts. An appropriate Order accompanies this Memorandum Opinion.

### ORDER

This matter comes before the Court on plaintiff's motion for summary judgment on Counts 2–18 of the complaint in the above captioned case. Defendants have cross-moved for summary judgment on all Counts. An approximately four-week trial was held on Count 1. As to the remaining Counts, the parties have briefed and orally argued their motions. For the reasons stated in the foregoing opinion, the Court hereby

**ORDERS** that plaintiff's motion for summary judgment be DENIED; the Court

**FURTHER ORDERS** that defendants' motion for summary judgment be **DENIED IN PART,** and **GRANTED IN PART.** Defendants' motion for summary judgment is **DENIED** as to Count 1 and **GRANTED** as to the remaining Counts; the Court

FURTHER ORDERS that JUDGMENT IN THE AMOUNT OF $1,202,143.07, PLUS PRE– AND POST–JUDGMENT INTEREST, BE ENTERED FOR DEFENDANTS and, after a trial on the merits, the Court finds that plaintiff is not entitled to offset said judgment based on the July 20, 1982, global settlement the government entered into with the Champlin Petroleum Company.