The **CRUDE COMPANY,**
Plaintiff–Appellant,

v.

**FEDERAL ENERGY REGULATORY COMMISSION and Department of Energy and The United States, Defendants–Appellees.**

No. 96–1317.

United States Court of Appeals,
Federal Circuit.

Feb. 2, 1998.

Rehearing Denied April 10, 1998.

John W. Vardaman, Williams & Connolly, Washington, DC, argued for plaintiff-appellant. On brief were Vincent J. Fuller, Michael R. Pompeo, and Marcie R. Ziegler. Counsel of record was Jerry L. Shulman.

Lawrence D. Rosenberg, Attorney, U.S. Department of Justice, Civil Division, argued for defendants-appellees. With him on brief were Frank W. Hunger, Assistant Attorney General, Eric H. Holder, Jr., United States Attorney, and Thomas W. Millett, Attorney. Of counsel on brief was Don W. Crockett, Office of General Counsel, United States Department of Energy, Washington, DC.

Before MAYER, Chief Judge,* SCHALL, and BRYSON, Circuit Judges.

* Chief Judge Haldane Robert Mayer assumed the position of Chief Judge on December 25, 1997.

BRYSON, Circuit Judge.

The Crude Company appeals from a decision of the United States District Court for the District of Columbia ordering it to pay $1,202,143.07, plus interest, to the United States. *Crude Co. v. FERC,* 923 F.Supp. 222 (D.D.C.1996). The district court upheld the decision of the Federal Energy Regulatory Commission holding The Crude Company liable for violations of the Department's oil price control regulations. We agree with the district court that the underlying administrative action must be sustained, and therefore affirm.

I

A

During the oil crisis of the 1970s, the government controlled the price of crude oil through a complex set of regulations. The regulations established two levels of price-controlled oil (lower tier "old oil" and upper tier "new oil") in addition to free market priced oil. Domestic oil produced up to a certain quantity could not be sold above the "old oil" price, while domestic oil produced above that quantity could be sold at the higher "new oil" price. Foreign crude oil and certain other types of oil could be sold at free market prices. *See United States v. Sutton,* 795 F.2d 1040, 1051 (Temp.Emer.Ct.App.1986). This multi-tiered price system was designed to minimize the inflationary impact of rising oil prices and to provide an incentive for increased domestic production. *See Cities Serv. Co. v. Federal Energy Admin.,* 529 F.2d 1016, 1021 (Temp.Emer.Ct.App.1975).

Because of disparities in access to price-controlled oil, the government set up an "entitlements" program that reallocated some of the cost benefits received by refiners who had access to large quantities of price-controlled oil to those refiners who relied on more expensive oil. Under the entitlements program, each refiner was issued monthly entitlements based on that refiner's proportionate share of all "old oil" refined on a nationwide basis. The program was based on the premise that all refiners should be allowed to refine an equal proportionate share of price-controlled oil each month. *See Cities Serv.,* 529 F.2d at 1021. An entitle-

ment was defined as the right of the refiner owning the entitlement to include one barrel of deemed old oil in its adjusted crude oil receipts in that month. 10 C.F.R. § 211.62 (1977).

If a refiner refined more "old oil" in a given month than its allocated number of entitlements, it was required to purchase additional entitlements. Conversely, if a refiner failed to use its allotted entitlements, it was required to sell its excess entitlements. The cost of an entitlement was set by the Department of Energy and was generally equal to the difference in price between the average cost of "old oil" and the average cost of non-price-controlled oil. *Sutton,* 795 F.2d at 1051–52; *Cities Serv.,* 529 F.2d at 1021.

In order to determine how many entitlements each refiner should receive, the government required each refiner to report its crude oil receipts and crude oil refined on a monthly basis. 10 C.F.R. §§ 211.66(b), 211.66(h) (1977). Because not all refiners had the capacity to refine all the oil they owned, the regulations permitted refiners to enter into "processing agreements" under which another refiner would refine the oil, while the original refiner retained ownership of the products refined from the crude oil. 10 C.F.R. § 211.62 (1977). When one refiner arranged to have another refiner process its crude oil under such an agreement, the refiner that actually processed the oil was permitted to exclude the oil from its monthly report, and the refiner on whose account the oil was processed was required to include the oil on its report. 10 C.F.R. § 211.67(d)(1) (1977).

Because small oil refiners experienced disproportionately high operating costs during the oil crisis, the government in 1974 made additional entitlements available to small refiners. Those entitlements, referred to as "small refiner bias" (SRB) entitlements, were issued on the basis of the amount of oil the small refiner refined each month.

Over time, some small refiners began to abuse the SRB benefits system by engaging in paper transactions to obtain SRB entitlements for oil that they did not really own. In such transactions, a large processing refiner would purport to sell crude oil to the

small refiner. The large refiner would then refine that oil for the small refiner's account. The small refiner would include the oil in its monthly report, thereby obtaining SRB entitlements. After the oil was processed, the small refiner would purport to sell the refined products back to the large processing refiner. These paper transactions would be entered into only to generate SRB entitlements by seemingly introducing the small refiner into the chain of ownership. *See Thriftway Co. v. Department of Energy*, 920 F.2d 23, 24 (Temp.Emer.Ct.App.1990).

In May 1976, the government issued a new regulation that eliminated SRB entitlements for processing agreements in which the crude oil was purchased from and the refined products were sold back to the processing refiner. *Thriftway*, 920 F.2d at 24 (citing 10 C.F.R. § 211.67(e)(2) (1977)). The preamble to the new regulation explained that it was "intended to prevent refiners from entering into processing agreements to process crude oil for a small refiner for no valid business purpose other than obtaining a portion of the benefits of the small refiner bias." 41 Fed. Reg. 9393 (1976). Nevertheless, refiners and crude oil owners continued to use processing agreements to manipulate the SRB entitlement program. Accordingly, as of June 1, 1977, the government amended the regulation to bar all processing agreements from qualifying for benefits under the SRB entitlements program. *Thriftway*, 920 F.2d at 24.

### B

In the 1970s, Southwestern Refining Company Inc. (SRCI) operated a small refinery in Wyoming that qualified for SRB entitlements. The Crude Company (TCC) was a crude oil reseller also located in Wyoming. Champlin Petroleum Company (Champlin) was a major refiner and marketer of petroleum products located in Corpus Christi, Texas. Between January and May of 1977, the three companies entered into a series of transactions that resulted in the generation of SRB entitlement benefits.

The transactions among the parties were documented in three agreements: (1) an agency agreement between SRCI and TCC; (2) a purchase and sale agreement between SRCI and TCC; and (3) a processing agreement between SRCI and Champlin. Under the agency agreement, TCC would deliver crude oil directly to Champlin. TCC would handle all the paperwork for the refining services and would pay the refining fees directly to Champlin. TCC would then arrange for delivery of the refined products. The agency agreement was backdated to reflect a previous oral agreement between SRCI and TCC.

Under the terms of the TCC–SRCI purchase and sale agreement, SRCI purported to purchase crude oil from TCC, refine the oil pursuant to the processing agreement with Champlin, and sell the refined product back to TCC. Although the agreement was purportedly executed on December 29, 1976, it was backdated, and in fact it was not even drafted until March or April of 1977, several months after the transactions had been under way.

The TCC–SRCI purchase and sale agreement provided that title to crude oil SRCI purportedly purchased from TCC would pass to SRCI as the crude oil entered Champlin's refining facilities; title to the refined products would pass back to TCC as the products left the refinery. While SRCI purportedly held legal title to the oil during the time it was in Champlin's refinery, the processing agreement between Champlin and SRCI provided that Champlin would bear the risk of loss for the oil during that time. After the refining process was completed, Champlin would deliver the refined products to TCC. TCC would then sell the refined products and pay SRCI 25 cents per barrel from the proceeds of the sale. The purchase and sale agreements provided that the entire arrangement would be terminated if SRCI failed to qualify for SRB benefits.

As a result of the three agreements, SRCI was not required to perform any services or assume any financial risk in connection with the acquisition and processing of the crude oil or the sale of the refined products. TCC was to acquire and pay for the crude oil; TCC was to arrange for delivery of the crude oil, pay for its processing, and purchase the refined products; and TCC had the sole authority to set the prices for SRCI's purchase of the crude oil and the sale of the refined products back to TCC.

TCC benefited from the arrangement because the SRB benefits reduced TCC's costs for the refined products it marketed, and because it obtained the proceeds of the sale of SRCI's excess entitlements. SRCI benefited from the arrangement by earning 25 cents per barrel without having to make any investment or expose itself to any risk of loss.

Neither SRCI nor TCC provided documentation establishing that SRCI actually paid for the crude oil or paid the processing fees associated with the reported volumes refined by Champlin. SRCI never submitted any accounting records substantiating its purchase of oil from TCC or its sale of refined products to TCC, nor did it log the processing fees in its expense records.

## C

In 1986, following a lengthy investigation, the Economic Regulatory Administration of the Department of Energy issued a proposed remedial order charging that the arrangement between TCC and SRCI violated the applicable version of the Mandatory Petroleum Allocation Regulations, 10 C.F.R. Pt. 211 (1977). The proposed remedial order alleged that TCC and SRCI had improperly used SRCI's small refiner status to obtain SRB benefits to which SRCI was not entitled.

When TCC and SRCI objected to the proposed remedial order, the Department of Energy's Office of Hearings and Appeals (OHA) conducted an administrative proceeding to review the factual and legal objections to the proposed order. At the conclusion of that proceeding, OHA overruled TCC's objections and issued a final remedial order against both TCC and SRCI.

OHA found that SRCI violated the reporting requirements of the Mandatory Petroleum Allocation Regulations, 10 C.F.R. §§ 211.66(d), 211.66(h), and 211.67(j) (1977), by reporting the crude oil that was processed under the processing agreement with Champlin, even though SRCI did not actually own the oil. As a result of those reports, OHA found, SRCI received SRB benefits to which it was not entitled. OHA also found that SRCI's participation in the agreements and its receipt of SRB benefits circumvented the regulatory provisions governing SRB entitlements and thus violated the "anti-circumvention" provision of the price control regulations, 10 C.F.R. § 205.202 (1977). With respect to TCC's objections to the proposed remedial order, OHA found that TCC was liable for the regulatory violations as a "central figure" or "animating force," based on its involvement with SRCI in the scheme. Quoting from *Sauder v. Department of Energy*, 648 F.2d 1341, 1347 (Temp.Emer.Ct.App.1981), OHA explained that TCC's "active involvement" with SRCI "is sufficient to establish TCC's liability as an animating force who it could 'fairly be said ... caused the overcharges.'" In summary, OHA found that Champlin was actually processing TCC's oil, that TCC inserted SRCI into the processing transaction with Champlin merely to obtain SRB benefits for which TCC was not otherwise eligible, and that TCC was liable for SRCI's reporting violations because its conduct caused SRCI to commit those violations.

TCC appealed the OHA decision to the Federal Energy Regulatory Commission (FERC), which upheld the remedial order. In particular, FERC upheld OHA's determination that SRCI was not an "owner" of the crude oil at issue, as required by the reporting regulations, and it upheld OHA's conclusion that TCC was responsible for the reporting violations under the "animating force" or "central figure" theory of liability. TCC then sought judicial review of the FERC decision by filing a complaint in the United States District Court for the District of Columbia. Because SRCI is insolvent, it did not take part in the district court action.

The first count of TCC's complaint in the district court alleged that any liability on its part should be offset against a $14.1 million settlement that the Department of Energy had previously reached with Champlin. The remaining counts of the complaint concerned TCC's challenges to the merits of the FERC decision upholding the remedial order. Following a four-week bench trial on the first count, the district court ruled against TCC, holding that it was not entitled to have any of its liability offset against the Champlin settlement. On the remaining counts, the district court granted the government's motion for summary judgment. The court therefore

upheld the remedial order and entered final judgment against TCC for $1,202,143.07, plus interest.

## II

TCC first argues that its liability should be offset against the proceeds of a 1982 settlement between Champlin and the Department of Energy. TCC contends that the Champlin settlement served in part to release Champlin from any potential civil liability for Champlin's involvement in the processing arrangement involving TCC and SRCI, and that a portion of the proceeds of the settlement must be regarded as attributable to the SRB violations stemming from that arrangement. For that reason, TCC argues, the government has already obtained restitution from Champlin for the SRB violations at issue in this case, and it should not be permitted to obtain what amounts to a second recovery from TCC.

Following trial on the restitution issue, the district court rejected TCC's claim that its liability should be offset against the government's settlement with Champlin. The court noted that the government had never charged Champlin with the violations it alleged against SRCI and TCC, and it concluded that there was no basis for the government to hold Champlin jointly liable with SRCI and TCC for those violations. Citing *United States v. Exxon Corp.,* 773 F.2d 1240 (Temp.Emer.Ct.App.1985), the court held that "rights under the Champlin Consent Order accrued solely to Champlin, and not to TCC or SRCI." The court therefore rejected TCC's claim that the government had already obtained restitution for the SRB violations through the Champlin settlement and that TCC should accordingly be released from its own liability for those violations.

TCC takes issue with the district court's analysis on several grounds, arguing that the court erred in allocating the burden of proof and improperly relied on the *Exxon* decision as barring TCC's double recovery claim. While TCC is correct that the *Exxon* case does not defeat its setoff claim, *see Conoco, Inc. v. Department of Energy,* 99 F.3d 387, 396 (Fed.Cir.1996), we nonetheless agree with the district court that TCC is not entitled to a credit against its liability for any portion of the Champlin settlement, because

the government introduced unrebutted evidence that no portion of the Champlin settlement constituted restitution for the SRB violations at issue in this case.

The Champlin settlement agreement lists several pending cases that were to be dismissed and probable violation notices that were to be rescinded in exchange for the settlement. None of the listed cases or probable violation notices concerned the SRB entitlement violations at issue in this case. Moreover, Champlin's representative in the settlement negotiations testified that no money was paid to settle the small refiner bias claims, and the government's negotiators testified to the same effect. Although TCC points to evidence suggesting that Champlin shared in the profits of the transactions and that the government had initially investigated whether Champlin might have violated the SRB regulations, that evidence does not indicate that the government ultimately concluded that Champlin was legally liable for the SRB violations. In fact, the evidence at trial showed that the government attorneys who participated in the investigation and settlement negotiations with Champlin ultimately concluded that Champlin was not an active participant in the TCC–SRCI arrangement to obtain SRB benefits and that there was no basis to pursue Champlin in connection with those charges.

The government argues that the Champlin settlement agreement did not encompass the SRB transactions at all and thus did not release Champlin from any potential liability in connection with those transactions. We need not decide that question, however, because even if the settlement agreement effected such a release, it does not follow that a portion of the settlement must have constituted restitution for those violations. The fact that a party obtains a "global release" from liability for a number of potential claims does not mean that the amount the party pays in exchange for the release constitutes restitution for every transaction for which a release is granted. *See Conoco,* 99 F.3d at 396. Because there was no evidence that any portion of the $14.1 million Champlin settlement constituted restitution for the SRB violations, we uphold the district court's

ruling that TCC's liability should not be offset by any portion of the Champlin settlement.

## III

■ TCC next argues that the transactions at issue in this case did not violate the regulations governing SRB entitlements, because SRCI was the legal owner of the oil that was the subject of the TCC–SRCI–Champlin transactions. For that reason, TCC argues, SRCI was entitled—indeed, required—to report the oil as its own and was authorized to obtain SRB entitlements based on its ownership of the oil. Because it was not until June 1, 1977, that the regulations were amended to bar the issuance of entitlements for processing agreements such as the one at issue in this case, *see* 10 C.F.R. § 211.67(e)(2) (1978), TCC argues that the government is, in effect, impermissibly applying the amended regulation retroactively to TCC.

The district court was correct in rejecting TCC's argument that the government's theory of liability was based on retroactive application of the amended regulation that barred the use of processing agreements to generate SRBs under any circumstances. To the contrary, FERC based its finding of liability on the sham nature of SRCI's putative ownership interest in the crude oil and thus the violation of the pre-amendment regulatory reporting requirement. FERC's liability analysis would be equally applicable if the Department of Energy had never promulgated the 1977 amendment to the reporting regulation. Moreover, there is no force to TCC's argument that the adoption of the 1977 amendment constitutes a recognition that arrangements such as the one at issue in this case were lawful prior to the regulatory change. The change in the regulation made all processing agreements ineligible for SRB benefits, regardless of whether they were based on sham transactions. The adoption of the 1977 amendment does not suggest that the prior regulation permitted the issuance of SRB benefits based on sham assertions of oil ownership.

It is true, as TCC contends, that at the time of the transactions at issue in this case, section 211.67(e)(2) prohibited only processing agreements in which crude oil was purchased from a processing refiner and sold, directly or indirectly, back to the processing refiner. *See* 10 C.F.R. § 211.67(e)(2) (1977). However, the fact that the arrangement between TCC and SRCI did not violate the prohibition in the version of section 211.67(e)(2) that was in effect at the time of the transactions at issue in this case does not mean that the parties' conduct was lawful or that the government is attempting to give retroactive effect to the later amendment to the regulation. Under the version of the regulations in effect at the time of the TCC–SRCI transactions, a small refiner was allowed to report crude oil processed for its account by another refiner, but only if the reporting refiner was the owner of the oil. *See* 10 C.F.R. § 211.66 (1977). FERC found that SRCI had only a sham ownership interest in the oil that was the subject of the Champlin processing agreement and that SRCI was therefore not the true owner of the oil. FERC therefore concluded that the oil that TCC "sold" to SRCI should not have been reported as SRCI's oil under section 211.66.

TCC argues that bare legal title is sufficient to establish ownership of oil for purposes of the reporting regulation, section 211.66, and that the government's interpretation of the reporting regulation as requiring more than bare legal title is simply a post hoc position adopted for the purposes of this case and thus not entitled to deference from the courts. The term "owner," however, does not have a fixed and unambiguous meaning without regard to context, and in litigation involving processing agreements, the Department of Energy has consistently taken the position that the term "owner" requires "more than bare legal title; it must also encompass direction and control of the crude oil and refined products." *Kenco Ref., Inc.,* 21 DOE (CCH) 83,009, at 86,186 (1991); *see also Thriftway Co.,* 39 FERC (CCH) 61,017, at 61,047 (1987); *Morrison Petroleum Co.,* 18 DOE (CCH) 83,014, at 86,100–04 (1989). Moreover, an agency may choose to interpret its regulations through adjudication as well through rulemaking, *see NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 290–95, 94 S.Ct. 1757, 1769–72, 40 L.Ed.2d 134 (1974); *Beazer East, Inc. v. EPA,* 963 F.2d 603, 609–

10 (3d Cir.1992), and OHA is recognized as having the authority to interpret Department of Energy regulations, *see Atlantic Richfield Co. v. United States Dep't of Energy,* 772 F.Supp. 654, 660 (D.D.C.1991). Because the Department's interpretation of section 211.66 of its own regulations is not "plainly erroneous or inconsistent with the regulation," *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945), we defer to that interpretation. *See Thriftway Co. v. Department of Energy,* 920 F.2d 23, 26 (Temp.Emer.Ct.App.1990); *United States v. Heller,* 726 F.2d 756, 762 (Temp.Emer.Ct.App.1983).

OHA's interpretation of the ownership requirement in the reporting regulations should not have come as a surprise to TCC, because the preamble to the May 1976 amendment to the regulations governing the SRB program made it clear that the Department's policy was to disallow entitlements based on processing agreements that had "no valid business purpose other than obtaining a portion of the benefits of the small refiner bias." And a regulatory interpretation that refuses to recognize "sham" transactions that are devised solely to evade regulatory requirements should be readily foreseeable. As the Temporary Emergency Court of Appeals stated in *Getty Oil Co. v. Department of Energy,* 749 F.2d 734, 737 (Temp.Emer.Ct.App.1984), with respect to an analogous issue of regulatory interpretation, a regulatory agency "is no more bound than is a court by the form in which regulated parties choose to cast a transaction, but may look beyond form to the economic substance, in order to further the regulatory purpose of Congress."

In support of its contention that the version of the regulations in effect before June 1, 1977, should not be interpreted to prohibit parties from obtaining SRB benefits through transactions such as the ones at issue in this case, TCC cites two internal government memorandums from 1983 in which Department of Energy officials expressed doubts about the viability of the proposed cases against Champlin and several small refiners, including SRCI. Those documents, however, merely reflect internal debate within the Department of Energy about whether to pursue

the SRB cases, a debate that was ultimately resolved in favor of going forward. The fact that some within the Department of Energy had doubts at a preliminary stage about whether the cases should be pursued does not buttress TCC's argument that the evidence ultimately presented in support of the remedial order in this case was insufficient to prove a regulatory violation.

TCC also relies on a declaration submitted by a TCC lawyer asserting that a senior lawyer within the Federal Energy Administration (the predecessor to the Department of Energy) had stated that the proposed TCC–SRCI–Champlin processing transaction would be lawful under the price control regulations then in force. OHA, however, stated that it was "not convinced that agency officials were given an accurate description of the true nature of the proposed arrangements between TCC, SRCI, and Champlin." In particular, OHA noted that the declaration submitted by TCC's lawyer "creates the impression that SRCI was an active partner in the processing agreements arranged by TCC with Champlin and that these agreements had real economic consequences." The district court agreed that the record was not clear as to the factual predicate upon which the government lawyer's opinion was based.

■ We agree with OHA and the district court that the declaration on which TCC relies is not sufficient to establish that the agency representative was given an accurate account of the proposed transaction, and for that reason any representation by the agency lawyer as to the probable lawfulness of the transaction would be of no value. More generally, the informal views of agency lawyers, like the views expressed in internal documents, are not binding on the government. *See MAPCO Int'l Inc. v. FERC,* 993 F.2d 235, 244 (Temp.Emer.Ct.App.1993); *Pennzoil Co. v. United States Dep't of Energy,* 680 F.2d 156, 171 (Temp.Emer.Ct.App.1982). TCC could have obtained an official interpretation of the regulations by filing a formal request under 10 C.F.R. § 205.80 (1977), *see* 39 Fed.Reg. 35,498 (Oct. 1, 1974) (identifying procedures for obtaining an interpretation of the regulation by filing a written request with the Federal Energy Administration and

stating that "verbal or written responses to general inquiries or to other than formal written requests for interpretation ... *are not interpretations* and merely provide general information") (emphasis added). Not having taken that step, TCC cannot now complain that the Department of Energy is foreclosed from interpreting its price control regulations to reach transactions such as the ones at issue in this case. *See Mobil Oil Corp. v. Tully,* 653 F.2d 497, 501–02 (Temp.Emer.Ct.App.1981).

■ With respect to the question whether SRCI was a true "owner" of the oil during its processing, we agree with the district court that FERC and OHA reasonably concluded that the purchase and sale transactions between TCC and SRCI constituted a sham. The agencies based their conclusion regarding the sham nature of the transactions not only on the fact that the transactions did not convey the normal incidents of ownership to SRCI, but also on the failure of TCC and SRCI to follow their normal business procedures of documenting the various elements of the transactions. FERC and OHA relied on evidence that both the purchase and sale agreement and the agency agreement between TCC and SRCI were backdated; that TCC and SRCI failed to document the purported purchases and sales of crude oil in their books and records; that SRCI failed to invoice TCC for the refined products; that the parties artificially fixed the prices for the refined products; that SRCI's SRB entitlements were transferred to TCC; that SRCI had no right to control any of the oil or refined products despite its purported ownership of the oil; and that SRCI was not exposed to any financial risk in connection with the transactions.

There was also substantial evidence that the TCC–SRCI–Champlin arrangement had no valid business purpose. OHA found that "the only purpose served by the purported transfer of the crude oil from TCC to SRCI, and the processing agreement between SRCI and Champlin, was the receipt of small refiner bias entitlements benefits by SRCI." OHA also rejected SRCI's contention that its purported goal of refinery expansion was advanced by the processing arrangement. Of course, the financial benefits that SRCI obtained from the arrangement with TCC were of use to SRCI in its other operations, but that is simply to say that funds obtained from the sham transactions contributed to the overall economic health of SRCI, which does not constitute a valid business purpose for the arrangement. Moreover, OHA found that prior to the arrangement TCC was already supplying SRCI with crude oil that was processed at SRCI's refinery, which undercut SRCI's argument that the arrangement with TCC helped it develop a business relationship with a significant crude oil supplier.

We find no reason to overturn these factual findings. Based on their detailed analysis of the transactions between TCC, SRCI, and Champlin, it was reasonable for OHA and FERC to conclude that SRCI's participation in the transactions, and its alleged "ownership" interest in the oil, lacked economic substance and constituted a sham. Because the Department of Energy reasonably interpreted its regulations to prohibit the use of such sham transactions to obtain SRB benefits, the district court properly upheld the administrative determination that SRCI violated the applicable version of the Mandatory Petroleum Allocation Regulations when it reported that it was the owner of the crude oil.

### IV

■ TCC next argues that even if SRCI is liable for the regulatory violations, it was improper to hold TCC jointly and severally liable with SRCI under the so-called "animating force" or "central figure" doctrine. According to TCC, the "animating force" or "central figure" doctrine may be used to impose liability only upon "individuals and entities that are directly responsible for the regulatory violations of the companies they own and operate."

In a series of cases beginning with *Sauder v. Department of Energy,* 648 F.2d 1341, 1347–49 (Temp.Emer.Ct.App.1981), the Temporary Emergency Court of Appeals held that a party that caused regulatory violations could be liable for the violations under the "animating force" or "central figure" doctrine, even if the party did not directly commit the violations. *See Citronelle–Mobile Gathering, Inc. v. Herrington,* 826 F.2d 16,

23–28 (Temp.Emer.Ct.App.1987); *United States v. Sutton*, 795 F.2d 1040, 1060–61 (Temp.Emer.Ct.App.1986); *United States v. Exxon Corp.*, 773 F.2d 1240, 1269–72 (Temp.Emer.Ct.App.1985). As TCC observes, that doctrine has been applied to hold corporate officers liable for regulatory violations committed by their corporations when the officers have participated in the transactions in question and personally benefited from them. *See, e.g., Houston Oil & Ref. Inc. v. FERC*, 95 F.3d 1126 (Fed.Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1819, 137 L.Ed.2d 1028 (1997). The doctrine, however, has not been limited to that context, but has also been applied when a particular individual or entity has caused other entities to commit regulatory violations. *See, e.g., Sauder; Exxon Corp.* As the Temporary Emergency Court of Appeals explicitly stated in the *Citronelle–Mobile* case, the doctrine is not limited to "the corporate-director realm," but operates more generally, "holding responsible the primary instruments of illegal conduct." 826 F.2d at 27.

FERC found that TCC was a central figure in the conduct that resulted in the unlawful receipt of SRB benefits and that TCC is therefore fully liable for the regulatory violations. Moreover, in upholding the remedial order, OHA explained that the same standard that has been applied to corporate officers who actively participate in their corporations' regulatory violations should be applied to a corporation "that actively participates in a scheme to obtain unwarranted regulatory benefits." Applying that standard, OHA and FERC concluded that TCC had both participated directly in transactions that resulted in regulatory violations and benefited from the transactions. While TCC challenges those factual findings, the evidence was clearly sufficient to sustain the findings on each issue.

With respect to the issue of participation, FERC found that, as SRCI's agent, TCC (1) assumed complete responsibility for negotiating and administering the processing agreements with Champlin; (2) purchased all of the crude oil, sold all of the resulting products and maintained the only books and records of the transactions; and (3) acted as SRCI's exclusive agent for the sale of the improperly obtained SRB entitlements. All of those actions were committed pursuant to

a plan that required, as a critical feature, that SRCI report the processed crude oil as its own, a requirement that was specifically made a condition of the agreement between TCC and SRCI.

With respect to the issue of benefit, FERC found that TCC benefited from the arrangement because, except for the 25 cents per barrel guaranteed to SRCI, TCC enjoyed all of the SRB benefits, which had the effect of reducing the costs of the refined products that TCC marketed and providing income to TCC from the sales of the excess entitlements. In particular, the evidence showed that TCC sold SRCI's excess entitlements and that when TCC remitted the proceeds of those sales to SRCI, SRCI in turn immediately wrote checks back to TCC for the same amount. Although the Department of Energy was not able to quantify the profits that TCC retained after all the aspects of the transactions were completed, it was not required to do so in order to prove that TCC benefited from the transactions. Because TCC participated in the scheme leading to the issuance of excess entitlements and shared in the proceeds of those excess entitlements, TCC was properly required to make restitution for the losses caused by the violations leading to the issuance of those entitlements. *See Citronelle–Mobile*, 826 F.2d at 27; *Exxon*, 773 F.2d at 1273; *Sauder*, 648 F.2d at 1348–49.

V

■ TCC next contends that OHA and FERC lacked the constitutional or statutory authority to adjudicate a claim against TCC under a theory of vicarious liability. Because TCC characterizes the government's "animating force" argument as based on a common law tort theory of vicarious liability, TCC argues that the government's claim could not be adjudicated in an administrative tribunal, but could only be litigated in an Article III court where TCC would enjoy the Seventh Amendment right to a jury trial.

This court has recently rejected an argument quite similar to TCC's. In *Houston Oil*, 95 F.3d at 1136, the appellant argued that the Department of Energy had unconstitutionally adjudicated a common law tort, in

violation of Article III and the Seventh Amendment. The court pointed out that in an enforcement action under the price control statutes, the government was enforcing what has been termed a "public right," and that such a claim can be adjudicated in an administrative forum without a jury trial. *See Citronelle–Mobile Gathering, Inc. v. Edwards,* 669 F.2d 717, 722 (Temp.Emer.Ct.App.1982) ("Actions by the United States [enforcing the oil price control regulations] are taken to enforce public, not private, rights."); *see generally Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 51, 109 S.Ct. 2782, 2795, 106 L.Ed.2d 26 (1989).

TCC seeks to distinguish *Houston Oil* on the ground that TCC's liability is not based on a direct violation of the regulation, as in *Houston Oil,* but is based instead on a tort theory of vicarious liability. If the government seeks to enforce the price control regulations on a theory of tort liability, TCC argues, it cannot act through an administrative forum, because Article III of the Constitution does not permit Congress to assign to administrative agencies the adjudication of matters traditionally reserved to the courts. The answer to TCC's argument is that in this case, as in *Houston Oil,* it is a "public right" that is being enforced, not a common law tort. The public right at issue is not converted into a common law tort simply because the theory of liability underlying the enforcement action is analogous to a common law tort theory of vicarious liability. *See Granfinanciera,* 492 U.S. at 52, 109 S.Ct. at 2795–96 ("Congress may fashion causes of action that are closely *analogous* to common-law claims and place them beyond the ambit of the Seventh Amendment by assigning their resolution to a forum in which jury trials are unavailable.").

### VI

Finally, TCC argues that it was improper for FERC to rule that TCC violated the anti-circumvention provision of the price control regulations, 10 C.F.R. § 205.202. That regulation provides:

> Any practice that circumvents or contravenes or results in a circumvention or contravention of the requirements of any provision of this chapter or any order issued pursuant thereto is a violation of the DOE regulations stated in this chapter.

According to TCC, the anti-circumvention regulation does not provide an independent basis for imposing liability absent the violation of some other, substantive regulation. Although the Department of Energy has consistently interpreted the anti-circumvention regulation not to require proof of an independent violation of the regulations, TCC relies on what it terms contrary authority from FERC.

First, TCC cites *RFB Petroleum, Inc.,* 48 FERC (CCH) 63,020 (1989), in which a FERC administrative judge stated that a violation of the anti-circumvention regulation could not be upheld absent proof that some other regulatory provision had been violated. That case is of no help to TCC, however, because the Commission reversed the administrative law judge's ruling in the *RFB Petroleum* case on the very point for which TCC cites the case. *See* 65 FERC (CCH) 61,283 (1993). As the Commission explained:

> The plain meaning of 10 C.F.R. § 205.202 is that a practice that circumvents the Mandatory Petroleum Regulations will violate those regulations. A practice circumvents the regulations if it frustrates or makes ineffectual one or more of the regulations or an order issued under them. The anti-circumvention regulation has broad concerns. It is addressed to practices that may avoid the regulatory scheme or render it ineffective. On its face, section 205.202 does not require that a respondent violate a specific regulation in Part 211 or Part 212, but, rather, considers actions in the context of their ability to negate the regulatory scheme.

*RFB Petroleum,* 65 FERC (CCH) 61,283 at 62,329.

TCC also cites portions of FERC's opinion in an earlier case, *Cities Servs. Oil & Gas Corp.,* 65 FERC (CCH) 61,403 at 63,111 (1993), to support its position. The sentence following the excerpt of that opinion quoted by TCC, however, states that "the Commission's ruling should not be read to reject the application of the anti-circumvention rules to instances where a company used a type of transaction to avoid entitlements obligations

under the entitlements program." *Id.* That opinion therefore offers no support for TCC's legal challenge to the application of the anti-circumvention regulation to this case. Moreover, the Commission's later opinion in the *RFB Petroleum* case resolved the issue in the government's favor as far as FERC was concerned.

Even apart from the FERC decisions on the issue, we agree with the government's interpretation of the anti-circumvention regulation. As the district court in this case noted, common sense dictates that the government need not demonstrate a violation of a separate regulation in order to support liability under section 205.202. "To hold that § 205.202 created liability only where there was an independent basis for liability would render the provision redundant." *Crude Co.,* 923 F.Supp. at 239.

There is ample evidence that TCC's activities in conjunction with SRCI constituted practices that circumvented the reporting requirements of the regulations. Indeed, the evidence clearly showed that the entire purpose of the arrangement between SRCI and TCC was to enable SRCI to report, as its own, oil that was in fact purchased, owned, processed, and sold, by and for the account of TCC. Consequently, FERC was justified in holding TCC liable for violating the anti-circumvention regulation.

*AFFIRMED.*